UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MICHAEL MARTINS | : | |
| | : | |
| v. | : | C.A. No. 11-539S |
| | : | |
| RHODE ISLAND HOSPITAL | : | |

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

Pending before me for a report and recommendation (28 U.S.C. § 636(b)(1)(B); LR Cv 72(a)) is Defendant's Motion for Summary Judgment. (Document No. 47). Plaintiff opposes the Motion. (Document No. 58). A hearing was held on February 20, 2014. For the following reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED in part and DENIED in part.

### Background

Plaintiff was formerly employed by Defendant Rhode Island Hospital (the "Hospital") as a Unit Assistant. Plaintiff was a Member of Teamsters Local Union No. 251 ("Local 251"), and his position as a Unit Assistant was covered by a Collective Bargaining Agreement between the Hospital and Local 251 (the "CBA"). Plaintiff was employed by the Hospital in various positions from on or about January 27, 2003 until his termination on September 24, 2010. Plaintiff was terminated for "theft of time." The Hospital concluded after an investigation that Plaintiff left the Hospital premises for approximately four hours during his scheduled work shift on September 11, 2010 without clocking out of the payroll system.

In his Amended Complaint, Plaintiff brings a total of nine claims against the Hospital.[1]  First, he alleges in Count II that the Hospital violated the CBA because it "did not have just cause to terminate [his] employment because [his] conduct on September 11, 2010 for which he was terminated was the result of a medical condition and did not rise to the level of deliberate misconduct." (Document No. 23 at p. 10).  Second, in Counts III, IV and V, Plaintiff alleges that the Hospital violated various Rhode Island anti-discrimination statutes by unlawfully terminating his employment "because he is disabled or because of his record of an impairment or because Defendant regarded him as having an impairment."  (Document No. 23 at pp. 11-12).  Third, in Counts VI, VII and VIII, Plaintiff alleges that the Hospital violated various Rhode Island anti-discrimination statutes by failing to reasonably accommodate his disabilities.  (Document No. 23 at pp. 12-15).  He further claims that the Hospital's failure to provide him with "a more accommodating work schedule" caused him to suffer an "exacerbation of his bi-polar disorder, which led to a manic episode and his four hours [sic] absence from work on September 11, 2010, the reason for his termination."  Id.  Finally, Plaintiff alleges in Counts IX and X that the Hospital violated his rights to job-protected medical leave under the Rhode Island and Federal medical leave statutes.

The Hospital moves for summary judgment as to all of Plaintiff's claims.  It argues that Count II (breach of the collective bargaining agreement) is untimely, unexhausted and legally deficient.  It argues that Counts III, IV and V (discriminatory discharge) fail because Plaintiff cannot show that he was treated differently than any other employees who stole time.  It argues that Counts VI, VII and VIII (failure to accommodate) fail because Plaintiff never put the Hospital on notice that he was requesting

---

[1] Plaintiff also brought claims against Local 251 and two of its officials regarding Local 251's refusal to pursue his grievance challenging the termination to arbitration under the CBA.  He ultimately stipulated to the dismissal of those claims on October 23, 2012.  (Document No. 28).

an accommodation. Finally, it argues that Counts IX and X (medical leave) fail because Plaintiff never put the Hospital on notice of any alleged serious health condition and never requested leave.

### Summary Judgment

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

-3-

Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249). Additionally, if the affirmative evidence presented by the nonmoving party raises a question of credibility as to the testimony provided by the moving party, summary judgment is inappropriate, and that credibility issue must be presented to the factfinders at trial. Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co., 149 F.2d 359, 363 (5th Cir. 1945) ("The success of an attempt to impeach a witness is always a jury question, as is the credibility of the witnesses where they contradict one another or themselves.").

**Facts**

The following facts are culled from the parties' competing statements of undisputed and disputed facts filed pursuant to Local Rule Cv 56(a). (Document Nos. 48, 61, 62, 73). While there are many undisputed facts, there are some important ones that are disputed and others that are far from clear.

Plaintiff worked both the day shift (7:00 a.m. to 3:00 p.m.) and the evening shift (3:00 p.m. to 11:00 p.m.) as a Unit Assistant. He did not work the night shift (11:00 p.m. to 7:00 a.m.). (Document No. 62 at ¶ 3). Plaintiff worked the evening shift on September 10, 2010. Id. at ¶ 4. Plaintiff did not badge out at the end of the shift. (Document No. 73 at ¶ 14). He asserts in his Affidavit that he forgot due to exhaustion. (Document No. 63-21 at ¶ 7). Plaintiff was scheduled to work the day shift on September 11, 2010. It was his fourth consecutive workday, and he was scheduled to work through

September 15, 2010 – another four consecutive days. (Document No. 62 at ¶ 7 and Document No. 73 at ¶ 8).

The actual events of September 11, 2010 are less clear. Plaintiff badged in to work at 6:23 a.m. and badged out at 10:19 a.m. (Document No. 63-6). Plaintiff asserts in his Affidavit that he cannot remember if he ever left the Hospital building during his work shift on September 11, 2010 and cannot explain why he was not present for "roll call" at 6:50 a.m. (Document No. 63-21 at ¶¶ 10-12). The following Monday, September 13, 2010, Plaintiff's Supervisor Cathy Fanning was alerted by the weekend charge nurse that Plaintiff could not be located during his shift on September 11, 2010. (Document No. 62 at ¶ 8). Ms. Fanning and Sandra Badessa, a Hospital Human Resources Representative, conducted an investigation that included reviewing badge swipe reports, parking lot entry/exit swipes and security camera images of Plaintiff entering and exiting the Hospital building on September 11, 2010. (Document No. 62 at ¶ 9). Based on this investigation, they concluded that Plaintiff left the Hospital for almost four hours during his work shift without badging out of the payroll system. Id. at ¶ 10. Although Plaintiff disputes this fact, he offers no competent evidence to account for his whereabouts during the September 11, 2010 shift and swears in his Affidavit that he has no memory or explanation. (Document No. 63-21 at ¶¶ 10-12).

Plaintiff did not report for work during the week commencing Sunday, September 12, 2010 and was placed on sick-leave status. (Document No. 73 at ¶ 9 and Document No. 63-18). Plaintiff was hospitalized from September 13, 2010 to September 15, 2010 and diagnosed with bipolar disorder, manic episode most recent. (Document No. 73 at ¶ 6 and Document No. 63-1). Plaintiff has a history of receiving medical treatment for bipolar disorder and insomnia prior to September 11, 2010. (Document No. 73 at ¶¶ 1, 2). Plaintiff was cleared to return to work and did so on September 20, 2010. (Document No. 62 at ¶ 11, Document No. 73 at ¶ 17 and Document No. 63-10). He was

suspended by Ms. Fanning after he reported to work on September 21, 2010 and was told to speak to his union representative.  (Document No. 62 at ¶ 12).

Plaintiff's employment as a Unit Assistant was terminated by the Hospital at a meeting held on September 24, 2010.  Plaintiff grieved the termination pursuant to the CBA on October 8, 2010. (Document No. 63-14).  Ultimately, the Hospital refused to reconsider its termination decision, and Local 251 refused to pursue the grievance to arbitration because it determined that it was "unlikely to prevail."  (Document No. 48-10 at p. 4).

Although Plaintiff has been treated for bipolar disorder and insomnia prior to September 11, 2010, it is undisputed that he never informed the Hospital of these medical conditions prior to September 24, 2010 – the date of termination.  (Document No. 62 at ¶¶ 14, 16-17).  He does, however, assert that he informed Ms. Fanning and another supervisor, Rory St. Pierre, that he had a "sleeping disorder."  Id. at ¶ 19.  In his Affidavit, Plaintiff asserts that "[a] reasonable accommodation of [his] disabilities would have consisted of a less-rigorous schedule: three days and two evenings instead of two days and three evenings; no evening shifts followed by a day shift; and no more than five consecutive work days."  (Document No. 63-21 at ¶ 25).  Plaintiff does not indicate when or if he ever made that specific accommodation request of the Hospital.  Plaintiff testified at his deposition that he informed Mr. St. Pierre that he could not work the night shift (11:00 p.m. to 7:00 a.m.), and it is undisputed that he was not scheduled for the night shift.  (Document No. 62 at ¶ 3 and Document No. 63-22 at p. 20).  Plaintiff also testified on July 8, 2013 that he expressed concern to Ms. Fanning prior to September 11, 2010 about his schedule, which consisted of three evening and two day shifts per week, and the difficulty in working a day shift following an evening shift because of his "sleep disorder."  (Document No. 62 at ¶ 19 and Document No. 63-22 at pp. 27-28).  In subsequent testimony on October 28, 2013, Plaintiff testified that he also asked Ms. Fanning not to schedule him for eight

consecutive workdays. (Document No. 48-4 at pp. 6-8). However, he was less sure about whether he told Ms. Fanning that he had a sleep disorder. Id. at p. 7.

The Hospital invites the Court to make a credibility determination regarding Plaintiff's accommodation claims. In particular, the Hospital points to inconsistencies in Plaintiff's allegations regarding the accommodation(s) he requested and that his story changed when his original theory turned out to be factually unsupported. In his administrative charge of discrimination and his original Superior Court Complaint in this litigation, Plaintiff alleged that he asked Ms. Fanning not to schedule him for more than five consecutive workdays and that September 10, 2010 was his seventh consecutive day of work. (Document No. 1-1 at ¶¶ 22, 24 and Document No. 48-5 at pp. 3-4). It is presently undisputed that September 10, 2010 was only Plaintiff's fourth consecutive workday, and Plaintiff has testified that he asked not to be scheduled for eight consecutive workdays and not for a day shift following an evening shift. The Hospital contends that Plaintiff's version shifted only after his counsel learned the truth at a settlement conference about how many consecutive shifts were actually worked by Plaintiff leading up to September 11, 2010. Thus, the Hospital asks the Court to essentially reject Plaintiff's deposition testimony as untruthful and conclude that there is insufficient evidence to create a genuine issue of material fact as to whether Plaintiff actually requested the accommodation now in question.

The Hospital relies upon Pina v. Children's Place, 740 F.3d 785 (1st Cir. 2014), as support for its request. In Pina, the First Circuit confirmed that it is not the duty of district courts to weigh the credibility of a party's testimony at the summary judgment stage but recognized that the court was not required to accept "contradictory and incomplete" testimony. Id. at 799. The plaintiff in Pina alleged that the employer failed to follow its complaint hotline procedures but admitted during her deposition that she could not recall ever even making a hotline report. Id. Thus, the Court appropriately found

no evidence to support her complaint about the hotline. Here, although Plaintiff's shift in theory is troubling and may provide the Hospital with fodder to attack Plaintiff's credibility at trial, the record is not comparable to Pina and is not sufficiently questionable to warrant the adverse credibility determination requested by the Hospital. While his recollection of detail is not strong, Plaintiff's deposition testimony over the two sessions is roughly consistent with itself and with the allegations in his Amended Complaint. The inconsistency lies with the sworn charge of discrimination and initial Superior Court complaint which were both drafted by counsel without the benefit of discovery and prior to Plaintiff's deposition testimony. While troubling, this record simply does not support the adverse credibility determination requested by the Hospital particularly since Rule 56 requires the Court to view the evidence in the light most favorable to Plaintiff and draw all reasonable inferences in his favor.

**Discussion**

**A.    Counts VI, VII and VIII – Failure to Accommodate**

In these Counts,[2] Plaintiff alleges that the Hospital failed to reasonably accommodate his disabilities, i.e., insomnia and bipolar disorder. He asserts that he informed the Hospital of the nature of his disabilities and "the detrimental effects of working back-to-back night and day shifts." (Document No. 23 at ¶¶ 83, 89, 95). He then claims that the Hospital violated the law by failing to engage in an interactive process to determine whether his disabilities could be reasonably accommodated and by failing to provide him with "a more accommodating work schedule." Id. at ¶¶ 85, 91, 97.

---

[2] Plaintiff alleges the Hospital violated the Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1, et seq.; the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1, et seq., and the Rhode Island Civil Rights of Peoples with Disabilities Act, R.I. Gen. Laws § 42-87-1, et seq.

The Hospital argues that Plaintiff's reasonable accommodation claims fail because he never requested an accommodation for a disability. It argues that it is undisputed that Plaintiff never informed the Hospital that he had insomnia or bipolar disorder and needed an accommodation. Further, it contends that Plaintiff's contradictory and inconclusive testimony about his sleeping disorder and scheduling concerns is not sufficient to establish a triable issue of fact.

Generally stated, a failure to accommodate claim requires a plaintiff to show that: (1) he is disabled within the meaning of the applicable law; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer knew of his disability but did not reasonably accommodate it upon a request. Henry v. United Bank, 686 F.3d 50, 59-60 (1st Cir. 2012) (citing Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 (1st Cir. 2010)). "However, before an employer's duty to provide reasonable accommodations – or even to participate in the 'interactive process'[3] is triggered..., the employee must make an adequate request, thereby putting the employer on notice." EEOC v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011). "Although the notice or request 'does not have to be in writing...or formally invoke the magic words 'reasonable accommodation,' it 'nonetheless must make clear that the employee wants assistance for his or her disability.'" Id. (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3rd Cir. 1999)).

Here, Plaintiff has identified sufficient evidence to present a trialworthy claim of failure to reasonably accommodate. It is undisputed that Plaintiff never specifically informed the Hospital about either his insomnia or bipolar disorder prior to September 24, 2010. However, he testified that he repeatedly informed both Ms. Fanning and Mr. St. Pierre that he had a "sleeping disorder," and it is

---

[3] The federal regulations implementing the Americans with Disabilities Act provide that it may be necessary for an employer "to initiate an informal, interactive process" with the disabled employee to determine the appropriate reasonable accommodation. 29 C.F.R. § 1630.2(o)(3); see also Enica v. Principi, 544 F.3d 328, 338-339 (1st Cir. 2008).

undisputed that insomnia is a common sleeping disorder. In addition, he testified that he asked both

Ms. Fanning and Mr. St. Pierre for certain scheduling relief due to his "sleeping disorder" including

a limit on consecutive workdays and not working a day shift following an evening shift. While the

Hospital challenges the credibility of such testimony, that is an argument to be made before a jury.

Under Rule 56, the Court must evaluate the competing evidence in the light most favorable to the

nonmoving party and draw all reasonable inferences in his favor. Doing so, the record is sufficient to

establish genuine issues of material fact as to whether Plaintiff triggered the Hospital's duty to

reasonably accommodate his sleeping disorder[4] and, if so, whether the Hospital breached that duty.

Accordingly, I recommend that the Hospital's Motion for Summary Judgment as to Counts VI, VII and

VIII be DENIED.

### B. Counts III, IV and V – Discriminatory Discharge

In these Counts,[5] Plaintiff alleges that the Hospital unlawfully terminated his employment

"because he is disabled or because of his record of an impairment or because Defendant regarded him

as having an impairment." (Document No. 23 at ¶¶ 76, 78, 80). The Hospital argues that these claims

fail because Plaintiff has no evidence of disparate treatment and no evidence to suggest that his

disability and not "theft of time" was the actual reason for his termination. Plaintiff counters that

genuine issues of material fact exist as to whether the Hospital's proffered reason for terminating him

is a pretext for disability discrimination.

---

[4] Plaintiff alternatively argues in his Opposition (Document No. 60 at pp. 49-52), that the Hospital also failed to reasonably accommodate his bipolar disorder by not retroactively granting him job-protected leave for his unexplained absence on September 11, 2010. However, that claim is not part of this case and will not be addressed. Counts VI, VII and VIII only allege the failure to provide "a more accommodating work schedule" and that Plaintiff had informed the Hospital of the "detrimental effects of working back-to-back night and day shifts."

[5] Plaintiff alleges the Hospital violated the Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1, et seq.; the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1, et seq., and the Rhode Island Civil Rights of Peoples with Disabilities Act, R.I. Gen. Laws § 42-87-1, et seq.

"A prima facie case of disability discrimination requires a showing that (1) the employee was disabled within the meaning of the relevant statutes, (2) the employee was able to perform the essential functions of his or her job (with or without reasonable accommodation), and (3) the employer discharged the employee in whole or in part because of the disability." Poulin v. Custom Craft, Inc., 996 A.2d 654, 658-659 (R.I. 2010) (citing DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 25 (R.I. 2005)). Under the burden-shifting framework applicable in employment discrimination cases, "[o]nce a prima facie case has been established, the employer then must offer a legitimate, nondiscriminatory reason for discharging that employee and then the employee must convince the fact-finder that the reason offered by the employer is a pretext for discriminatory animus." DeCamp, 875 A.2d at 25.

The Hospital's position is clear. It could not locate Plaintiff during his shift on September 11, 2010. It conducted an investigation and concluded that Plaintiff left the Hospital without clocking out of the payroll system. A meeting was held with Plaintiff and his union representative on September 24, 2010, and he was terminated, effective that day, for "theft of time." Thus, the Hospital argues that no rational jury could reasonably infer disability discrimination from those facts, and summary judgment is appropriate.

Plaintiff's position is less clear. In his Statement of Disputed Facts, Plaintiff specifically disputes that he left the building during his shift on September 11, 2010 and was paid for hours during which he did not perform any work. (Document No. 62 at ¶¶ 5-6). He asserts that he does not remember leaving and "believes he was working during the four hours for which he was paid." Id. However, he avers in his Affidavit that, if he did leave work on September 11, 2010, "it was not intentional, but rather, because I was suffering from a manic episode of my bipolar disorder on that day." (Document No. 63-21 at ¶ 27).

Plaintiff testified at his deposition that he believed that the Hospital terminated his employment "[b]ecause they thought I stole time." (Document No. 48-1 at p. 2). He was asked if he believed there was any "ulterior motive" for the termination, and the only possibility he offered was that he had just finished training a part-time worker and someone may have wanted to get her into a job at the Hospital. Id. at pp. 2-3. It is undisputed that Plaintiff informed Ms. Fanning and Ms. Badessa about his bipolar disorder during the September 24, 2010 meeting. Plaintiff testified that he initially tried to explain his whereabouts on September 11, 2010 but later disclosed his bipolar disorder and indicated that it could explain his behavior that day. Id. at pp. 18-20. He testified that he was told that his employment was terminated at this meeting. Id.

In his Affidavit, Plaintiff testifies that his union representative told him that Ms. Fanning and Ms. Badessa "did not believe [him] when [he] stated the reason [he] could not remember what happened on September 11, 2010 was because [he has] bipolar disorder." (Document No. 63-21 at ¶ 18). In his Opposition, Plaintiff argues that "[n]one of the key players and decision makers in this case believed that [his] disabilities played any role in his behavior on September 11, 2010 even when [he] presented them with solid medical evidence[6] proving the contrary." (Document No. 60 at p. 42) (emphasis added).

If none of the decision makers believed Plaintiff's explanation, as he argues, then they must have believed that he stole time by leaving the Hospital during his work shift without clocking out of the payroll system. In other words, the Hospital fired Plaintiff "[b]ecause they thought [he] stole time"

---

[6] Plaintiff does not provide a citation for such "evidence." He is presumably relying upon his September 13, 2010 hospitalization and the February 10, 2011 letter of his treating psychiatrist, Dr. Pamela Shervanick, who opines that Plaintiff's medical condition "can account for his strange behavior" on September 11, 2010, although it is undisputed that she did not examine Plaintiff on September 11, 2010, and there are no medical records regarding his condition that day. (Document No. 63-5). While relevant to the issue, this evidence does not conclusively prove the contrary as suggested by Plaintiff.

just as he testified he believed at his deposition. (Document No. 48-1 at p. 2). Accordingly, Plaintiff has not identified sufficient competent evidence from which a reasonable jury could conclude that he was discharged, in whole or in part, due to his disabilities.

Even assuming Plaintiff could raise the inference of unlawful discrimination created by a prima facie case, the Hospital has articulated a legitimate, nondiscriminatory reason, i.e., theft of time, for the termination decision, and Plaintiff has not presented a trialworthy claim of pretext. In fact, Plaintiff's pretext argument is fundamentally flawed. "In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." Adamson v. Walgreens Co., _____ F.3d _____, 2014 WL 1674164 at 4 (1st Cir. April 29, 2014) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991)). A pretext for discrimination is more than a mere mistake or business error or unfair decision, it is "a dishonest explanation," "deceit used to cover one's tracks." Clay v. Holy Cross Hosp., 253 F.3d 1000, 1005 (7th Cir. 2001). "For a plaintiff to impugn the veracity of the employer's proffered reason is insufficient; instead, a plaintiff must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a sham intended to cover up the employer's true motive." Ponte v. Steelcase, Inc., 741 F.3d 310, 323 (1st Cir. 2014). Plaintiff has failed to do so and, in fact, he concedes that none of the decision makers believed that his disabilities played any role in his behavior on September 11, 2010. Moreover, it strains credibility to contend that Ms. Fanning and Ms. Badessa manufactured Plaintiff's theft of time as a sham reason to terminate him because of his disabilities when it is undisputed that he did not reveal his bipolar condition until the September 24, 2010 disciplinary meeting which resulted in his termination. It is also undisputed that, prior to such meeting, Ms. Fanning and Ms. Badessa had already investigated Plaintiff's disappearance on September 11, 2010, and he was suspended for such activities on September 21, 2010. Plaintiff's pretext claim

simply does not hold water. Accordingly, I recommend that the Hospital's Motion for Summary Judgment as to Counts III, IV and V be GRANTED.

### C. Count II – Violation of the Collective Bargaining Agreement

In Count II, Plaintiff alleges a violation of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Plaintiff alleges that the Hospital violated the CBA because it did not have "just cause" to terminate his employment because his conduct on September 11, 2010 was "the result of a medical condition and did not rise to the level of deliberate misconduct." (Document No. 23 at ¶¶ 72-73).[7]

The Hospital argues that Count II is untimely and legally insufficient. First, as to timeliness, both parties agree that the applicable statute of limitations is six months. See DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 172 (1983). The parties disagree as to when Count II accrued. The Hospital argues that it accrued when Plaintiff was terminated on September 24, 2010 and thus he did not file his Section 301 claim within six months. Plaintiff counters that the claim did not accrue until June 29, 2011 when Local 251 notified him that it would not be pursuing his grievance to arbitration and thus his Section 301 claim was timely filed. (See Document No. 63-17).

In Arriaga-Zayas v. Int'l Ladies' Garment Workers' Union – Puerto Rico Council, 835 F.2d 11, 13 (1st Cir. 1987), the First Circuit held that "[a] cause of action in a hybrid Section 301/fair representation suit arises when the plaintiff knows, or reasonably should know, of the acts constituting the union's alleged wrongdoing." See also Demars v. Gen. Dynamics Corp., 779 F.2d 95, 97 (1st Cir. 1985) (claim accrued when union withdrew grievance). Thus, Plaintiff's claim did not accrue until

---

[7] Plaintiff's original Superior Court Complaint contained an unfair representation claim against Local 251 which alleged that Local 251 breached its duty of fair representation by not submitting his termination grievance to arbitration under the CBA. (Document No. 1-1 at ¶¶ 67-70). Plaintiff dropped that claim when he filed his Amended Complaint (Document No. 23) and ultimately stipulated to the dismissal of all claims against Local 251 and its officers. (Document No. 28).

Local 251 informed him on June 29, 2011 that it would not pursue his grievance to arbitration and thus Count II was timely filed.

This outcome is consistent with the dual burdens facing a plaintiff in a hybrid Section 301/duty of fair representation suit. As clearly stated by the Supreme Court:

> Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on § 301, since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the Union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. "Yet the two claims are inextricably interdependent. 'To prevail against either the company or the Union,...[employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union.'" Mitchell, 451 U.S. at 66-67 (Stewart, J., concurring in the judgment), quoting Hines, 424 U.S. at 570-571. The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.

DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164-165 (1983) (emphasis added). Thus, although Plaintiff's injuries arise out of his termination, Local 251's alleged breach of the duty of fair representation is an essential element of his Section 301 claim, and that claim did not arise until Local 251 abandoned his grievance on June 29, 2011. See Wilson v. Int'l Bhd. of Teamsters, 83 F.3d 747, 757 (6th Cir. 1996) ("a party is not required to sue on a hybrid claim until the arbitration panel renders its final decision, or until the party reasonably should know that the union has abandoned the party's claim"). Accordingly, since Plaintiff filed his original Superior Court Complaint on or about September 15, 2011, his Section 301 claim was timely filed.

The Hospital also argues that Count II should be dismissed because Plaintiff cannot prove Local 251 violated its duty of fair representation. See Almeida v. E. Util. Corp., No. 99-CV-269, 1999 WL 33454805 at *4 (D.R.I. Nov. 24, 1999) (a hybrid 301/duty of fair representation claim requires the plaintiff to prove both that the employer breached the collective bargaining agreement and that the

union violated its duty of fair representation, and "[f]ailure to prove either of these claims will doom the entire § 301 claim"). To establish a violation of the duty of fair representation, Plaintiff must show that Local 251's handling of his grievance was "arbitrary, discriminatory, or in bad faith." <u>Vaca v. Sipes</u>, 386 U.S. 171, 190 (1967). The Hospital contends that Local 251 took reasonable steps to pursue Plaintiff's grievance, unsuccessfully requested that the Hospital reconsider its decision, and ultimately decided not to pursue the claim to arbitration because it was "unlikely to prevail." (Document No. 63-17). The Hospital argues that this conclusion was "more than reasonable" and identifies all of the evidence of record supporting its argument. (Document No. 47-1 at pp. 10-12). Plaintiff completely fails to respond to this argument in his Opposition. (<u>See</u> Document No. 60 at pp. 56-57). Thus, any responsive argument that Local 251 acted arbitrarily, capriciously or in bad faith when it elected not to proceed to arbitration is deemed waived. <u>See</u> <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); and <u>Rivera-Gomez v. de Castro</u>, 843 F.2d 631, 635 (1st Cir. 1988) ("a litigant has an obligation to spell out its arguments squarely and distinctly or else forever hold its peace").

Instead of directly addressing the Hospital's argument on the merits, Plaintiff simply argues that he will be able to establish a violation of the duty of fair representation because Local 251 never took his grievance to a Step 3 hearing. However, the Step 3 theory has never previously been alleged and is simply not part of this case. Plaintiff's "unfair representation" claim in his original Superior Court Complaint alleges that Local 251 breached the duty of fair representation by "failing to submit his grievance to arbitration." (Document No. 1-1 at ¶ 68). It mentions nothing about Step 3 of the grievance process. In fact, the lengthy factual allegations in both Plaintiff's initial and Amended Complaint do not include a single reference to Step 3 or any claims or allegations related to Step 3.

Plaintiff's claims are not a moving target. They are framed by the pleadings, and Plaintiff is not free to assert new claims in legal memoranda.

Even if the Step 3 theory was properly plead, it is a red herring. There is no indication in the record that Plaintiff ever demanded a Step 3 hearing and, although there is no record of a formal Step 3 grievance meeting, the record shows that Local 251 communicated directly with Mr. Louis Sperling, the Hospital's Vice President Human Resources and Labor Relations and Step 3 hearing designee, and advocated for Plaintiff by requesting reconsideration of the termination decision for medical reasons. (See Document No. 63-15 and Document No. 63-16). The Hospital did not change its position, so the only available recourse was binding arbitration which Local 251 elected not to pursue. The absence of a Step 3 "hearing" is irrelevant to the actual claim asserted and, as noted above, later abandoned by Plaintiff that Local 251 breached its duty of fair representation by "failing to submit his grievance to arbitration."

For the foregoing reasons, I conclude that Plaintiff has not presented a legally viable Section 301 claim, and I recommend that the Hospital's Motion for Summary Judgment as to Count II be GRANTED.

### D. Counts IX and X – Interference with Leave Rights

In Counts IX and X, Plaintiff alleges that the Hospital violated the Rhode Island Parental and Family Medical Leave Act, R.I. Gen. Laws § 28-48-1, et seq. ("RIFMLA"), and the federal Family and Medical Leave Act, 29 U.S.C. § 2601, et seq. ("FMLA"), "by interfering with, restraining and/or denying [his] exercise of rights provided...by terminating [his] employment during the time period for which he was entitled to take medical leave." (Document No. 23 at ¶¶ 106, 115). Plaintiff asserts that he was entitled to statutory medical leave on September 11, 2010, but his serious health condition rendered him incapable of notifying the Hospital of his need for leave. He further asserts that the

Hospital's knowledge of his three-day hospitalization following his bizarre behavior on September 11, 2010 provided the Hospital with sufficient notice of his need for leave.  Id. at ¶¶ 103-105, 112-114.

The Hospital argues that Counts IX and X fail because Plaintiff never gave the Hospital adequate notice that he required protected leave.  The Hospital also notes that it is undisputed that Plaintiff never requested FMLA leave from the Hospital prior to his termination.  (Document No. 62 at ¶ 13).  Plaintiff counters that summary judgment is inappropriate because genuine issues of material fact exist as to whether (1) the change in his behavior was enough to notify a reasonable employer that he suffered from a serious health condition on September 11, 2010; or (2) that he was mentally unable either to work or to give notice of his need for FMLA leave on September 11, 2010.  Thus, he contends that he was entitled to FMLA leave covering his alleged four-hour absence on September 11, 2010 and to job reinstatement when his serious health condition had abated.  (Document No. 60 at p. 53).

Since the Hospital's argument focuses on lack of adequate notice, it is necessary to examine the notice requirements under the RIFMLA and the FMLA.  The RIFMLA requires the employee to provide "advance notice" of the need for medical leave and that the "employee shall give at least thirty (30) days notice of the intended date upon which...leave shall commence and terminate, unless prevented by medical emergency from giving the notice."  R.I. Gen. Laws § 28-48-2(a).  The FMLA regulations provide that when the need for leave is unforeseeable, "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a).

Plaintiff's argument is again a bit of a moving target.  In Counts IX and X, Plaintiff alleges that his serious health condition "rendered him incapable of notifying the Hospital of his need for FMLA leave" but the circumstances of his hospitalization following his bizarre behavior on September 11, 2010 "provided his employer with sufficient notice of the need for FMLA leave."  (Document No. 23

-18-

at ¶¶ 103-105, 112-114).   In other words, the circumstances should have put the Hospital on constructive notice that he needed FMLA leave on the day in question.  In his Opposition, Plaintiff relies solely upon Byrne v. Avon Prod., Inc., 328 F.3d 379 (7ᵗʰ Cir. 2003), for the proposition that a change in behavior can be enough to notify a reasonable employer that an employee is suffering from a serious health condition and needs FMLA leave.  The Court in Byrne relied upon a prior version of the FMLA regulations (29 C.F.R. § 825.303(a)) which stated then, when leave is unforeseeable, "[i]t is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." Id. at p. 382.  (emphasis omitted).  Based on this "extraordinary circumstances" exception, the Court concluded that the plaintiff's "unusual behavior" was "itself notice that something had gone medically wrong, or perhaps notice was excused." Id. at p. 381 (emphasis in original).

Subsequently, the U.S. Department of Labor deleted the "extraordinary circumstances" language relied upon by the Byrne court from the notice regulation and the current version of 29 C.F.R. § 825.303(a) provides that "[i]t generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable to such leave."   In view of this substantive regulatory charge, subsequent courts have declined to adopt the "constructive notice" doctrine recognized in Byrne since it has no statutory or regulatory basis.  See Bosley v. Cargill Meat Solutions Crop., 705 F.3d 777, 783 (8ᵗʰ Cir. 2013); and Scobey v. Nucor Steel-Arkansas, 580 F.3d 781, 788 (8ᵗʰ Cir. 2009).

After being put on notice of the questionable validity of the Byrne case by the Hospital's Reply Memorandum, Plaintiff's counsel made clear at the February 20, 2014 hearing that he was not relying upon a constructive notice theory.  He argued that Plaintiff provided the Hospital with "actual notice"

on September 24, 2010 when he told Ms. Fanning and Ms. Badessa that he was bipolar and that could explain his behavior on September 11, 2010. (See Document No. 48-1 at pp. 18-20).

First, Plaintiff's present actual notice claim is not what he plead in Counts IX and X of his Amended Complaint. Counts IX and X plainly make a claim of constructive, not actual, notice. In particular, Plaintiff alleges that his serious health condition on September 11, 2010 rendered him "incapable" of notifying the Hospital of his need for FMLA leave, that, "upon information and belief," the Hospital was aware of his hospitalization from September 13-15, 2010 and that the "hospitalization following his bizarre behavior on September 11, 2010 provided his employer with sufficient notice of the need for FMLA leave." (Document No. 23 at ¶¶ 103-105, 112-114). He alleged that the circumstances were enough to put the Hospital on notice. He did not allege, as he now argues, that his statements at the September 24, 2010 meeting gave actual notice to the Hospital. Thus, his new actual notice argument has not been plead and is not before the Court.

Even assuming that Counts IX and X could be construed to encompass an actual notice claim, Plaintiff's statements at the September 24, 2010 termination meeting were not specific enough to constitute actual notice. An employer's duties under the FMLA are "triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." Kobus v. College of St. Scholastica, Inc., 608 F.3d 1034, 1036-1037 (8th Cir. 2010). Although the regulations do not require the employee to invoke the FMLA by name, the employee must provide "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b); Woods v. DaimlerChrysler Corp., 409 F.3d 984, 992 (8th Cir. 2005) (requiring employee to provide notice as soon as both possible and practical that a serious health condition caused his absence).

Plaintiff testified that he did not specifically request FMLA leave at the September 24, 2010 meeting.  (Document No. 48-1 at p. 19).  When asked to explain his whereabouts on September 11, 2010, Plaintiff testified that he initially said he was "around the hospital," "what room I might have been in, the stockroom, and I just tried to tell her [to] the best of my ability."  Id. at p. 18.  He also testified that he said that "maybe" a co-worker Andrew Fortes had seen him.[8]  (Document No. 63-22 at pp. 38-39).  He did not concede that he left the Hospital premises during his work shift and, in fact, still technically disputes that fact.  (Document No. 62 at ¶¶ 5-6).  He testified that he disclosed his bipolar disorder "somewhere in the middle of the meeting towards the end" after his union representative said "Michael, this doesn't make any sense.  Where were you?  None of this is making sense." (Document No. 63-23 at p. 3).  He offered that his bipolar disorder "could" explain the reason for his behavior on September 11, 2010.  (Document No. 63-22 at p. 40).  He did not provide any medical documentation to support his claim nor did he explain the circumstances of his hospitalization from September 13-15, 2010.  (Document No. 65-10 at pp. 35-36).  His speculative reference on September 24, 2010 to his bipolar disorder as a possible explanation for his disappearance on September 11, 2010 is simply not sufficient notice under these unique circumstances to trigger any obligations under either the FMLA or RIFMLA.  Further, as discussed supra, Plaintiff concedes that the decision makers simply did not believe his bipolar explanation, and he was terminated shortly after his disclosure.  Plaintiff did not present enough information to the Hospital on September 24, 2010 to put it on notice that he was requesting retroactive designation of his unexplained absence as leave or that the FMLA or RIFMLA may apply to the situation.  Accordingly, I recommend that the Hospital's Motion for Summary Judgment as to Counts IX and X be GRANTED.

---

[8]  There is a factual dispute as to whether or not Plaintiff asked Mr. Fortes to lie or cover for him, but such dispute is not material to the resolution of Counts IX and X.

**Conclusion**

For the foregoing reasons, I recommend that the Hospital's Motion for Summary Judgment (Document No. 47) be GRANTED as to Counts II, III, IV, V, IX and X, and DENIED as to Counts VI, VII and VIII.[9]

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


  /s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
May 12, 2014

---

[9] Counts I and XI have previously been dismissed by stipulation. (Document No. 28).